UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FATIMA MUSTAFIC,                )
                                )
        Plaintiff,              )
                                )
        v.                      )        No. 4:16 CV 837 CDP
                                )
NANCY A. BERRYHILL, Acting      )
Commissioner of Social Security,[1] )
                                )
        Defendant.              )

## MEMORANDUM AND ORDER

Plaintiff Fatima Mustafic brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of the Commissioner's final decision denying

her applications for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401, *et seq*.; and for supplemental security income

(SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*.  Because I find the

Commissioner's decision to not be supported by substantial evidence on the record

as a whole, I will reverse the decision and remand the matter to the Commissioner

for further proceedings.

### Procedural History

On August 19, 2013, Mustafic applied for DIB and SSI claiming she became

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Under Fed. R. Civ. P. 25(d), Berryhill is automatically substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this action.

disabled on May 30, 2013, because of osteoarthritis of the bilateral knees, obesity, depression, post-traumatic stress disorder, anxiety disorder, gastritis/epigastric pain, insomnia, hyperlipidemia, headaches, uterine myoma, and menorrhagia. The Social Security Administration denied both applications on October 3, 2013. At Mustafic's request, a hearing was held before an administrative law judge (ALJ) on May 19, 2015, at which Mustafic and a vocational expert testified. On June 2, 2015, the ALJ entered a written decision denying Mustafic's claims for benefits, finding her able to perform her past relevant work as a housekeeper. On May 20, 2016, after reviewing additional evidence, the Appeals Council denied Mustafic's request for review of the ALJ's adverse decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Mustafic contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ improperly discounted her subjective complaints and improperly weighed the opinion evidence of record. Mustafic also claims that the ALJ failed to explain the basis for the physical limitations included in his residual functional capacity (RFC) assessment. For the reasons that follow, I will reverse the decision and remand the matter for further proceedings.

**Evidence Before the ALJ**

*Mustafic's Testimony*

At the hearing on May 19, 2015, Mustafic testified in response to questions posed by the ALJ and counsel.  Mustafic, who is Bosnian, testified with the assistance of a Bosnian interpreter.

At the time of the hearing, Mustafic was fifty-three years old.  She stands five feet, six inches tall and weighs 192 pounds.  (Tr. 33-34.)  She lives in an apartment with her husband.  She has three adult children who no longer live with her.  (Tr. 38.)  Mustafic came to the United States from Bosnia in 1988.  (Tr. 41.)  She does not speak or understand English.  She communicates with her doctors through her husband and daughter, and was able to communicate at work through Bosnian co-workers.  (Tr. 34, 42.)  Mustafic went to school for two years in Bosnia.  (Tr. 40.)

Mustafic's Work History Report shows that she worked as a commercial housekeeper in 1998 and 1999, cleaning stadium seating.  From 1999 to May 2013, she worker as a hotel housekeeper.  (Tr. 191-93.)  Mustafic testified that she can no longer work because she is unable to do anything.  (Tr. 37.)

Mustafic testified that she has knee and leg pain and experiences dizziness with both standing and sitting.  (Tr. 37-38.)  She takes medication but it does not help with her knee pain.  (Tr. 43.)

Mustafic testified that she experiences headaches and nightmares that interfere with her sleep. She sees Dr. Farzana who prescribes medication for her headaches. Her sleep disturbances are related to her memories of the Bosnian war and what happened to her father and brothers during the war. She testified that her brother's body was recently found and that he was to be buried sometime during the summer. Mustafic testified that she is also affected by her daughter's death, and especially when she sees her daughter's friends who are now grown and have families. Mustafic has crying spells two or three times a day.[2] (Tr. 42-43.) She also frequently forgets things and has trouble focusing and concentrating. She testified that her husband does not want her to be alone. (Tr. 38.)

As to her exertional abilities, Mustafic testified that she can lift about a gallon of water. She can stand for short periods of time and has problems with both standing and sitting because of dizziness. She testified that her doctor told her not to walk a lot because of problems with her knees and veins. (Tr. 37-38.)

As to her daily activities, Mustafic testified that she watches television, but only for the "pictures" because she does not understand English. She does not like to speak a lot when she is out. She prefers to stay home with her husband. She mostly sits throughout the day. She sometimes goes outside. She does not shower if she feels dizzy, and her husband sometimes walks with her to the bathroom

_____

[2] It was noted that Mustafic was having a crying spell during the administrative hearing, which she attributed to her having to talk about her family tragedies. (Tr. 43.)

because of her dizziness. Her daughters sometimes help her with personal hygiene. (Tr. 34, 37-39.) Mustafic does very little housekeeping; her husband and daughters perform most of the work. She sometimes cooks but is afraid to do so because she leaves the oven on. Mustafic does not have a driver's license, does not drive, and has never used public transportation. (Tr. 39-40.)

*Vocational Expert Testimony*

Dr. Robin Cook, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel. Ms. Cook classified Mustafic's past work as a housekeeper as light and unskilled. (Tr. 22).

The ALJ asked Ms. Cook to assume an individual of Mustafic's age with Mustafic's education and past relevant work. The ALJ asked Ms. Cook to assume that the person was limited to less than light work in that she can

> lift and carry up to 20 pounds occasionally and lift or carry up to 10 pounds frequently; stand and/or walk for six hours out of an eight-hour day and sit for six hours out of an eight-hour work day; never climb ladders, ropes, and scaffolds; can occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; should never work at unprotected heights or with moving mechanical parts; can occasionally work in vibration.
>
> This individual would be limited to occupations that do not require fluency in the English language. And they can perform simple, routine tasks and have occasional interaction with supervisors, coworkers, and the general public.

(Tr. 46.) Ms. Cook testified that such a person could perform Mustafic's past work as a housekeeper, both as actually performed and generally performed in the

national economy.  (Tr. 47.)  Ms. Cook further testified that if the person also required a sit-stand option, she could not perform Mustafic's past work as a housekeeper but could perform other work in the national economy such as sewing machine operator, photocopy machine operator, and bakery worker.  (Tr. 48-49.) She also testified that employers tolerate only one absence a month from work. (Tr. 51.)

*Medical Records*

Mustafic underwent a CT scan of the head and brain in February 2010 in response to her reports of lightheadedness, dizziness, and headaches.  The results of the CT scan were unremarkable.  (Tr. 329.)

Mustafic visited Dr. Farida Farzana at Psych Care Consultants on January 21, 2013.  She reported that her daughter was killed in a car accident in 2003 and that her father and brothers were killed in war.  She currently was experiencing poor sleep and nightmares, and she wanted to isolate herself.  She reported that she has bad headaches, dizziness, poor memory, and is unable to concentrate.  She said that she works only a few days.  Mental status examination showed Mustafic to have poor eye contact and to be sullen, guarded, and suspicious.  She was observed to be sad, anxious, and depressed.  Her affect was flat, blunted, and constricted. Her concentration and ability to perform serial sevens was impaired.  Both recent and remote memory was also impaired.  She appeared preoccupied.  Dr. Farzana

found Mustafic to have mildly impaired judgment and limited insight. Dr. Farzana diagnosed Mustafic with prolonged post-traumatic stress disorder (PTSD) and major depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 31.[3] Mirtazapine (Remeron) was prescribed, and Mustafic was instructed to return in one month. (Tr. 238, 284-85.)

Mustafic visited Esse Health on January 29, 2013, with complaints of pain and dizziness associated with heavy menstruation. Taking Tylenol helped. (Tr. 260-62.)

Mustafic visited Dr. Farzana on February 18, 2013, and reported that she continued to not sleep well, was depressed and sad, and was worried about gynecological health problems. Dr. Farzana increased Mustafic's dosage of mirtazapine. (Tr. 283.)

Mustafic returned to Esse Health on February 27, 2013, with complaints of dizziness. She reported that she almost collapsed and could not get up. She also reported having a ringing sensation in her ears for two to three months. Mustafic was diagnosed with labyrinthitis and was prescribed meclizine. (Tr. 254-57.)

---

[3] At the time Dr. Farzana assigned this score, the fourth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) provided the GAF scale to rate social, occupational, and psychological functioning on a hypothetical continuum of mental health illness. *See* DSM-IV at 32-34. The fifth edition of the DSM issued in May 2013 does not provide this scale. According to the DSM-IV, a GAF score of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* DSM-IV at 34.

On March 18, 2013, Mustafic visited Dr. Farzana who noted her to be very distressed and depressed. Mustafic kept crying during her appointment. She reported that she was sick and was falling down and was worried about her health. She continued to grieve over her daughter's death. Mustafic reported that she stopped taking mirtazapine a week earlier because of concern about side effects. Dr. Farzana explained medication side effects and provided a three months' supply of medication. (Tr. 282.) On April 19, Mustafic reported to Dr. Farzana that she was constantly worried about her children having accidents and dying as her one daughter had. She also reported having severe headaches and dizziness. Mustafic was instructed to continue with her medication. (Tr. 281.)

Mustafic went to the emergency room at St. Mary's Health Center on May 11, 2013, with complaints of right knee pain after falling at work the day before. It was reported that she continued to work the remainder of the day, but that she was currently unable to work. Mustafic reported the pain to be at a level eight on a scale of one to ten. She reported the pain to worsen with movement. Examination showed swelling and tenderness about the knee medially and laterally. An x-ray of the knee was negative. It was determined that Mustafic had a soft tissue injury and knee sprain, but leg injury could not be excluded. The knee was placed in an immobilizer and Mustafic was given Tramadol and ibuprofen for pain. She was instructed to ice the knee and to follow up with orthopedics. (Tr. 363-69.)

On May 15, 2013, Mustafic visited Esse Health with complaints of right knee pain. It was noted that she was in no acute distress or discomfort. Esse Health explained that they could not examine or treat the injury because it was work-related. Esse Health offered to contact an orthopedist for follow up, but Mustafic's son indicated that they would check with Mustafic's employer and arrange to have her seen by a worker's compensation doctor. (Tr. 247.)

Mustafic returned to Dr. Farzana on August 16, 2013. It was noted that she had recently traveled to Bosnia and was sad because of the several family members she had lost to the war. It was also noted that Mustafic always thinks of how her sixteen-year-old daughter was killed in an accident. Mustafic continued to report that she had severe headaches. Mental status examination showed Mustafic to have poor eye contact and to be sullen and guarded. She was depressed, sad, and anxious. Dr. Farzana noted Mustafic to be preoccupied. Mustafic reported feeling helpless and having low self-worth. Her concentration was noted to be impaired, as well her recent and remote memory. Mustafic's judgment was moderately impaired and her insight was poor. Dr. Farzana continued to diagnose Mustafic with PTSD and major depressive disorder and continued her on her current medication. (Tr. 280.)

On September 13, 2013, Mustafic visited Dr. Farzana who noted her to appear sad and withdrawn. Mustafic's husband reported that she was always quiet,

"does not do much of anything," and is always remembering her daughter who was killed.  Mustafic was continued in her diagnoses and medication and was instructed to return in one month.  (Tr. 288.)

On October 3, 2013, Steven Akeson, Psy.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that Mustafic's affective disorder and anxiety disorder caused mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  He also found that Mustafic had no episodes of decompensation of extended duration.  In making this determination, Dr. Akeson reviewed Dr. Farzana's treatment notes as well as notes from physical examinations.  (Tr. 58-59.)

In a Mental RFC Assessment completed that same date, Dr. Akeson opined that Mustafic was moderately limited in her ability to understand and remember detailed instructions but otherwise was not significantly limited in the domain of understanding and memory.  In the domain of concentration and persistence, Dr. Akeson opined that Mustafic was moderately limited in her ability to carry out detailed instructions and in her ability to maintain attention and concentration for extended periods, but otherwise was not significantly limited.  Dr. Akeson opined that Mustafic's language barrier caused moderate limitations in her social ability to

interact appropriately with the general public, to ask simple questions and request assistance, and to accept instructions and respond appropriately to criticism from supervisors. Dr. Akeson opined that she had no adaptation limitations. Dr. Akeson concluded that Mustafic could acquire and retain simple to moderately complex instructions, and could sustain concentration and persistence with simple repetitive tasks to moderately complex tasks. He also opined that Mustafic could adapt to changes in moderately demanding work settings and would do best with limited public contact because of the language barrier. (Tr. 60-62.)

On October 11, 2013, Mustafic reported to Dr. Farzana that she continued to be very depressed, did not sleep well, and had nightmares. No change was made to her treatment regimen. (Tr. 297.)

Mustafic returned to Esse Health on October 22, 2013, with complaints of chronic headaches. Given their chronic nature, it was recommended that Mustafic undergo scanning, but her husband declined because of lack of insurance. Mustafic also complained of vertigo, cervicalgia, and insomnia, which were thought to be contributing to her headaches. Depression was also thought to be a contributing factor. Methocarbamol was prescribed for cervicalgia. It was noted that the medication may help for insomnia as well. Amitriptyline was considered for sleep, headaches, and underlying depression. Mustafic was continued on meclizine for dizziness. (Tr. 299-305.)

On November 21, 2013, Mustafic reported to Dr. Farzana that she felt helpless. She had recently been denied citizenship because she could not answer the questions in English. She reported being worried because of her inability to learn anything new. No changes were made to Mustafic's treatment regimen. (Tr. 296.)

Mustafic visited Esse Health on December 23, 2013, and reported having continued chronic daily headaches, intermittent dizziness, chronic cervicalgia, and knee pain. Her depression and insomnia were noted to be possible contributing factors to her headache condition. Mustafic was prescribed amitriptyline for headaches. It was recommended that Mustafic see a neurologist for her dizziness, but she declined because of lack of insurance. Examination of the knees showed mild bony enlargement, no swelling, mild tenderness, and mild limitation in motion. Mustafic was instructed to take Tylenol for knee pain and to apply ice and lose weight. (Tr. 306-12.)

Mustafic returned to Dr. Farzana on December 26, 2013, and reported having severe headaches, dizziness, and severe depression. It was noted that she had applied for disability because she was unable to "hold any job." Dr. Farzana determined to continue Mustafic on her medication and supportive therapy. No changes were made in the treatment regimen. (Tr. 295.)

On February 12, 2014, Mustafic reported to Dr. Farzana that she had

constant headaches and could not sleep.  It was noted that she was taking amitriptyline for her headaches.  No changes were made in Mustafic's treatment. (Tr. 294.)

Mustafic visited Esse Health on April 2, 2014, and complained of bilateral knee pain, headaches, and insomnia.  It was noted that underlying depression may be a factor with her headaches.  Mustafic reported her insomnia to have improved with Remeron as prescribed by Dr. Farzana.  As to her knee pain, Mustafic reported that it was painful to walk but she had minimal discomfort with sitting or reclining.  It was especially painful when she squats or bends her knees.  Little swelling was noted.  Examination showed bony enlargements about the knees with tenderness about the medial joint lines.  Ligaments were stable.  Mustafic was prescribed Mobic for knee pain and her dosage of amitriptyline was increased for headaches.  (Tr. 313-17.)

On April 17, 2014, Mustafic continued to complain to Dr. Farzana that she was not sleeping well.  She continued to report thinking of her brothers and father who died in the Bosnian war and of her daughter who was killed in an accident. She also reported having pain in her hands and legs and that she stopped working the previous year because of the hard work and because she kept fainting on the job.  It was noted that Mustafic was currently taking Meloxicam for leg pain.  Dr. Farzana continued Mustafic on her medication as prescribed.  (Tr. 293.)  On June

19, Mustafic's husband reported to Dr. Farzana that she remained isolated and to herself and continued to grieve the loss of her daughter. No changes were made in Mustafic's treatment. (Tr. 292.)

Mustafic visited Esse Health on August 8, 2014, for follow up of several health issues, including gastritis, joint pain, insomnia, and obesity. With respect to her joint pain, it was noted that Mustafic's bilateral knee pain was probably osteoarthritis and that she presently took Tylenol for the pain. It was noted that Mobic was no longer effective. Mustafic reported that her knees were stiff and that she had difficulty kneeling or flexing fully. Examination showed moderate bony enlargement of the knees, bilaterally, with tender joint lines and mildly limited flexion. No redness, effusion, or heat was noted. X-rays were offered, but Mustafic declined because of lack of insurance. It was noted that the family had applied for a patient assistance program, but they had received no response. Mustafic was instructed to apply ice, exercise, and lose weight. It was noted that amitriptyline was helping with insomnia. Mustafic's other medications were noted to include meclizine, Remeron, and Tramadol. (Tr. 320-24, 327-28.)

Mustafic returned to Dr. Farzana in August and November 2014. No changes were observed in her presentation, nor were any changes made to her treatment regimen. (Tr. 290, 291.)

On February 18, 2015, Mustafic visited Dr. Farzana and reported not feeling

well and having a lot of health issues. She reported that she stays home and always thinks of her daughter. Mustafic was continued in her diagnoses of PTSD and major depressive disorder and was continued on mirtazapine. (Tr. 289.)

Mustafic visited Dr. Vani Pachalla at Grace Hill Health Center on March 4, 2015, for general examination. Mustafic complained of depression and reported having some difficulty in functioning. Dr. Pachalla noted Mustafic to have anxious and fearful thoughts, depressed mood, diminished interest, and difficulty concentrating. Mustafic's health questionnaire showed her to suffer from moderate depression. Dr. Pachalla determined Mustafic's depression to be stable with medication. Mustafic also complained of bilateral knee pain and reported that her general pain was at a level eight. Her medication was noted to include amitriptyline, methocarbamol, mirtazapine, and Soma. Physical examination showed tenderness about the left knee and swelling about the right knee. Range of motion of both knees was moderately limited with pain. Mild varicose veins were also noted bilaterally. Mustafic's obesity was also noted. Mustafic was diagnosed with chronic knee pain for which she was instructed as to exercises for arthritis and to lose weight. Diagnostic evaluations were ordered. Mustafic was also instructed to wear TED hose for her varicose veins. (Tr. 391-95.)

X-rays of the knees taken on March 4 showed moderate narrowing of the medical aspect of the medial compartment of the right knee; and mild narrowing of

the medial compartment of the left knee with minimal degenerative spurring. (Tr. 397.)

Mustafic returned to Dr. Farzana on April 14, 2015, and reported having headaches and being too depressed. She complained of feeling sick and of having pain in her legs. Dr. Farzana noted Mustafic to appear nervous and preoccupied and that she "kept holding her head in her hands[.]" Dr. Farzana determined to continue Mustafic on Remeron at her already-prescribed dosage. (Tr. 418.)

Dr. Farzana completed a Mental RFC Questionnaire on April 14, 2015, in which she reported that Mustafic suffered from chronic PTSD and had poor response to treatment. Dr. Farzana reported that Mustafic experienced dizziness, drowsiness, fatigue, and lethargy as side effects of her medications. Dr. Farzana described Mustafic as lethargic, preoccupied, depressed, and lacking energy and reported her prognosis to be guarded or poor. Dr. Farzana indicated that Mustafic displayed several signs and symptoms of her impairment, including difficulty thinking or concentrating, seclusiveness, and sleep disturbance. With respect to Mustafic's mental abilities and aptitudes needed to perform unskilled work, Dr. Farzana opined that she was unable to meet competitive standards in all areas, including working in coordination with others without being unduly distracted, asking simple questions or request assistance, understand or carry out very short and simple instructions, and dealing with normal work stress. Dr. Farzana reported

that Mustafic's depression exacerbated her experience of pain. Dr. Farzana opined that Mustafic would miss work three or more days a month because of her impairment, and that her impairment has lasted or is expected to last at least twelve months. Dr. Farzana reported that Mustafic was not a malingerer. (Tr. 371-75.)

## Evidence Submitted to and Considered by the Appeals Council[4]

On June 8, 2015, Dr. Pachalla completed a Physical RFC Questionnaire in which he reported Mustafic's diagnoses to be depression, degenerative joint disease of the knees, epigastric pain, chronic headaches, and varicose veins. He reported her prognosis to be good. He also reported that Mustafic's depression affected her physical condition. Dr. Pachalla reported that Mustafic experienced knee pain with movement, which made it difficult for her to walk. Dr. Pachalla also opined that Mustafic's pain or other symptoms would occasionally interfere with her attention and concentration, noting that she needed an interpreter since she could not speak English. He further opined that Mustafic could walk one city block without rest or severe pain. He opined that she could sit at one time for forty-five minutes to two hours and could stand at one time for thirty minutes to one hour. Dr. Pachalla opined that Mustafic could sit a total of about six hours in an eight-hour workday and stand or walk less than two hours in an eight-hour

---

[4] Evidence submitted to and considered by the Appeals Council is part of the administrative record before me for judicial review. On this administrative record, which now includes the new evidence, I must determine whether the ALJ's decision is supported by substantial evidence. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000).

workday.  Dr. Pachalla also opined that Mustafic would need to shift positions at will from standing, sitting, or walking and that she would need unscheduled breaks every two to three hours during the workday.  Dr. Pachalla opined that Mustafic could occasionally lift up to fifty pounds.  Dr. Pachalla opined that Mustafic would miss work two or three days a month because of her impairments or related treatment.  He also opined that degenerative joint disease of the knees and chronic headaches would affect her ability to work at a regular job on a full time basis.  (Tr. 436-39.)

## The ALJ's Decision

The ALJ found that Mustafic met the insured status requirements of the Social Security Act through December 31, 2017, and that she had not engaged in substantial gainful activity since May 30, 2013, the alleged onset date of disability.  The ALJ also found that Mustafic's osteoarthritis of the bilateral knees, obesity, depression, and PTSD were severe impairments, but that they did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 11-12.).  The ALJ found that Mustafic had the RFC to perform light work, in that she could

> lift and carry up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday.  She can never climb ladders, ropes and scaffolds.  She can occasionally climb ramps and stairs, balance, kneel, crouch, and crawl.  She can never work at unprotected heights or with moving mechanical parts

- 18 -

and occasionally work in vibration.  The claimant is limited to occupations that do not require fluency in the English language.  She can perform simple, routine tasks.  In addition, she can have occasional interaction with the supervisors, coworkers and the general public.

(Tr. 13.)  Considering Mustafic's RFC, the ALJ found her able to perform her past relevant work as a housekeeper / cleaner as such work is generally performed at an unskilled, light exertional level as well as how she actually performed the work at the medium level of exertion.  (Tr. 18.)

The ALJ thus found Mustafic not to be under a disability from May 30, 2013, through the date of the decision.  (Tr. 20.)

## Discussion

To be eligible for DIB and SSI under the Social Security Act, Mustafic must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs*., 955 F.2d 552 , 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her]

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389 , 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

As noted above, Mustafic argues that the ALJ improperly discounted her subjective complaints and improperly weighed the opinion evidence of record. She also claims that the ALJ failed to explain the basis for the physical limitations included in his residual functional capacity (RFC) assessment. I will address each of Mustafic's arguments in turn.

<u>Credibility Determination</u>

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating thereto, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and courts should defer to an ALJ's explicit findings. *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016).

In his decision, the ALJ found the objective evidence not to support Mustafic's complaints of knee pain. The ALJ noted that Mustafic had reported having chronic knee pain for years but that she apparently was able to work with such pain before May 2013. The ALJ acknowledged that Mustafic most likely

exacerbated the pain when she fell at work, but he noted that she did not follow up with an orthopedic evaluation as recommended. The ALJ determined that failure to see a specialist for treatment is evidence that the condition is not as debilitating as claimed. The ALJ also noted that Mustafic did not consistently complain of knee pain to her healthcare providers nor sought aggressive treatment or injections for the pain. He also noted that x-rays showed only mild to moderate deterioration, which would support a degree of limitation but not the degree Mustafic claimed.

As to the credibility of Mustafic's complaints regarding her mental impairments, the ALJ noted that Mustafic was not always compliant with Dr. Farzana's treatment recommendations and that Dr. Farzana never changed her medication, increase its dosage, prescribe psychotherapy, or advise grief counseling despite Mustafic's continued complaints of depression and grief. The ALJ considered this conservative approach to be evidence that "Dr. Farzana seemed to believe that, despite the feedback she was receiving, the claimant's treatment protocol was adequate." (Tr. 17.) The ALJ also noted that the losses experienced by Mustafic that gave rise to her depression and grief occurred long before she stopped working, thus demonstrating that she was able to work despite her grief. The ALJ also considered that Mustafic did not seek alternative methods of treatment nor asked for different medication, which would indicate that she believed that the medication provided relief. The ALJ also found that Mustafic's

ability to take a trip to Bosnia showed her able to function at a higher level than reported.

I find the ALJ's adverse credibility determination not to be supported by substantial evidence. First, contrary to the ALJ's finding that Mustafic did not consistently complain of knee pain, the record shows that after her fall in May 2013, Mustafic complained of knee pain and leg pain at nearly every physical examination she had – in May and December 2013, April and August 2014, and in March 2015. To the extent the ALJ determined that Mustafic's failure to seek aggressive treatment or treatment from specialists shows her pain not to be as severe as she claimed, I note that the ALJ wholly failed to consider Mustafic's demonstrated inability to afford such treatment. *See Benson v. Heckler*, 780 F.2d 16, 18 (8th Cir. 1985); *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984). Economic justification for limited or lack of treatment can be relevant to a disability determination. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992). *See also Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) (conservative approach to treatment not significant in credibility determination given claimant's financial constraints); *Ricketts v. Secretary of Health & Human Servs.*, 902 F.2d 661, 663-64 (8th Cir. 1990) (in view of claimant's limited financial resources, court does not believe that failure to take prescription medication is inconsistent with, or requires disbelief of, subjective complaints).

I am even more troubled by the ALJ's treatment of Mustafic's complaints regarding her mental impairments. In discrediting these complaints, the ALJ found that Mustafic was not always compliant with Dr. Farzana's treatment recommendations. The record shows, however, that such "noncompliance" occurred on one occasion because of Mustafic's concern regarding medication side effects after her medication dosage was increased. After Dr. Farzana discussed potential side effects with Mustafic, she resumed taking the medication and never stopped. The ALJ's finding of noncompliance is not supported by the record.

The ALJ also determined that Dr. Farzana's consistent course of treatment without change "seemed" to demonstrate her belief that such treatment was effective and, further, that Mustafic's failure to seek alternative treatment indicated her belief that the treatment provided relief. The record is replete with evidence, however, that Mustafic's mental condition did not improve, she obtained little if any relief, and both her physical and mental healthcare providers observed her continued state of depression. Indeed, on several occasions, Mustafic's healthcare providers noted that Mustafic's depression may be contributing to her physical complaints. The ALJ's suggestion that Dr. Farzana's failure to change medication, recommend psychotherapy, or provide grief counseling shows Mustafic's current treatment regimen to be effective amounts to the ALJ "playing doctor" and improperly substituting his beliefs for that of medical professionals. *See Pate-*

*Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990). An ALJ's own belief as to what the medical evidence should show does not constitute substantial evidence to support an adverse credibility determination. *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989).

Finally, the ALJ's determination to discredit Mustafic's complaints on account of her ability to work after experiencing her grief-inducing losses is short-sighted. As the Eighth Circuit has observed, "PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation." *Jones v. Chater*, 65 F.3d 102, 103 (8th Cir. 1995). *See also Stanfield v. Chater*, 970 F. Supp. 1440, 1461 (E.D. Mo. 1997). Here, Mustafic's daughter was sixteen years old when she was killed in a car accident. Mustafic testified that she is particularly affected by this death now because she sees her daughter's friends who now have families of their own. In addition, before Mustafic applied for disability benefits, she travelled to Bosnia where her father and brothers were killed during the war. For Mustafic to experience symptoms of PTSD long after the actual occurrence of these tragic events upon being exposed to reminders of such events is consistent with the nature of the impairment. Given the nature of PTSD, the ALJ erred when he considered the delayed effects of the impairment to render Mustafic's complaints

not credible. *Cf. Jones*, 65 F.3d at 103 (look to nature of the condition).

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to Mustafic's complaints or that the evidence he considered so contradicted Mustafic's subjective complaints that Mustafic's testimony could be discounted as not credible. *Masterson v. Barnhart*, 363 F.3d at 731,738-39 (8th Cir. 2004); *Baumgarten v. Chater*, 75 F.3d 366, 370 (8th Cir. 1996). Accordingly, the ALJ's adverse credibility determination is not supported by substantial evidence on the record as a whole. Because the ALJ's decision fails to demonstrate that he considered all of the evidence under the standards set out in *Polaski*, I will remand this matter to the Commissioner for an appropriate analysis of Mustafic's credibility in the manner required by and for the reasons discussed in *Polaski*.

## Weight Given to Opinion Evidence

When evaluating opinion evidence, an ALJ is required to explain in his decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well

supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with other substantial evidence in the record. *Id.; see also*

*Forehand*, 364 F.3d at 986. This is so because a treating physician has the best

opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

that and any other medical opinion of record, including the length of the treatment

relationship and the frequency of examination, the nature and extent of the

treatment relationship, whether the physician provides support for her findings,

whether other evidence in the record is consistent with the physician's findings,

and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c), (e) and

416.927(c), (e). Inconsistency with other substantial evidence alone is a sufficient

basis upon which an ALJ may discount a treating physician's opinion. *Goff v.*

*Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005). The Commissioner "will always

give good reasons in [the] notice of determination or decision for the weight [given

to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ discounted the opinions rendered in Dr. Farzana's mental RFC assessment and accorded them only some weight, finding that the conservative nature of the treatment she gave was inconsistent with her opinion that Mustafic could not meet competitive standards of employment. The ALJ questioned why Dr. Farzana did not treat Mustafic's symptoms more aggressively if she considered them to be so limiting. As discussed above, however, the ALJ's questioning of Dr. Farzana's treatment methodology amounts to the ALJ and improperly substituting his beliefs for that of medical professionals. *See Pate-Fires*, 564 F.3d at 946-47 (citing *Rohan*, 98 F.3d at 970); *Ness*, 904 F.2d at 435. The ALJ also found that Dr. Farzana's treatment notes did not support her opinion of debilitating symptoms, finding the notes to be cursory and to lack detailed discussion of symptoms. Contrary to this finding, however, a review of Dr. Farzana's notes shows that she repeatedly detailed Mustafic's depression, sadness, worry, inability to sleep, crying, and isolation. While the ALJ properly noted that the checklist format of Dr. Farzana's RFC assessment detracts from its weight, *see Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010), the other unsupported reasons to discount Dr. Farzana's opinion cast doubt on the ALJ's overall conclusion to accord only some weight to this treating physician's opinion. *See Baumgarten*, 75 F.3d at 369-70.

The ALJ determined to accord "more weight" to the opinion of the non-

examining State agency consultant, Dr. Akeson, finding it to be more consistent with the other evidence of record, including Mustafic's conservative treatment and her ability to work despite having already experienced the losses that caused her grief. As discussed above, these reasons are not supported by substantial evidence on the record as a whole. Further, I note that Dr. Akeson rendered his opinion based on an incomplete record. He did not have the benefit of an additional eighteen months' of treatment records, including Dr. Farzana's RFC assessment and records from Mustafic's physical healthcare providers who suggested that her depression may be a factor in and exacerbate her physical pain. When evaluating a non-examining source's opinion, the ALJ must evaluate "the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). *See also McCoy v. Astrue,* 648 F.3d 605, 616 (8th Cir. 2011) (where non-examining source did not have access to relevant medical records, opinion is accorded less weight); *Wildman*, 596 F.3d at 967 (same).

The ALJ did not consider Dr. Akeson's lack of access to several treatment records as well as to opinion evidence from Mustafic's treating psychiatrist, which the ALJ improperly discounted. To accord more weight to Dr. Akeson's opinion evidence in these circumstances was error. *See Wildman,* 596 F.3d at 967.

Where an ALJ makes a faulty credibility determination, the resulting RFC is called into question because it does not include all of the claimant's limitations. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001). *See also Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) ("Subjective complaints . . . are often central to a determination of a claimant's RFC."). This is especially true where, as here, evidence of record shows a possible relationship between a claimant's level of pain and the severity of her mental impairment. *See Delrosa v. Sullivan*, 922 F.2d 480, 485-86 (8th Cir. 1991) (citing *Chitwood v. Bowen*, 788 F.2d 1376, 1378 (8th Cir. 1986); *Herbert v. Heckler*, 783 F.2d 128, 131 (8th Cir. 1986)). Moreover, given the ALJ's improper determination to discount the medical opinion of Mustafic's treating source, coupled with his unsupported determination to accord more weight to the opinion of a non-examining State agency consultant, it cannot be said that the resulting RFC assessment is supported by substantial evidence on the record as a whole. *See generally Leckenby v.Astrue*, 487 F.3d 626 (8th Cir. 2007). I will therefore remand this matter to the Commissioner for further proceedings.

Upon remand, the Commissioner shall obtain and provide the parties an opportunity to submit additional medical evidence that addresses Mustafic's ability to function in the workplace, which may include contacting her treating physical

and mental healthcare providers to clarify her limitations and restrictions in order to ascertain what level of work, if any, she is able to perform. *See Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006). This additional evidence shall include the medical evidence submitted to and considered by the Appeals Council. The ALJ is also permitted to order additional examinations and tests in order for him to make an informed decision regarding the extent to which Mustafic's physical and mental impairments, both severe and non-severe, affect her ability to perform work-related activities. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. §§ 404.1517, 416.907. Upon receipt of any additional evidence, the ALJ shall reconsider the record as a whole, reevaluate any opinion evidence as well as the credibility of Mustafic's own description of her symptoms and limitations, and reassess Mustafic's RFC. Such reassessed RFC must be based on some medical evidence in the record and must be accompanied by a discussion and description of how the evidence supports each RFC conclusion. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A separate Judgment is entered herewith.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 10th day of October, 2017.